```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

***************************
UNITED STATES OF AMERICA,
         Plaintiff

vs.                                  Case No. 3:16-cr-30044-MGM-1

ALBERTO MARTE,
         Defendant
***************************
UNITED STATES OF AMERICA,
         Plaintiff

vs.                                  Case No. 3:16-cr-30044-MGM-8

JUAN PEREZ,
         Defendant
***************************


             TRANSCRIPT OF EVIDENTIARY HEARING
        BEFORE THE HONORABLE KATHERINE A. ROBERTSON
              AT SPRINGFIELD, MASSACHUSETTS
                  ON AUGUST 21, 2018


APPEARANCES:

For the Government:
Neil L. Desroches, Assistant United States Attorney
United States Attorney's Office
300 State Street, Suite 230
Springfield, Massachusetts 01105
413-785-0398




Transcriber:  Karen M. Aveyard,
              Approved Federal Court Transcriber

     ----------------------------------------------------
```

**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**
**k.aveyard@comcast.net**

APPEARANCES (continued):

For Defendant Alberto Marte:
Arthur J. O'Donald, III, Esquire
1859 Northampton Street
Holyoke, Massachusetts 01040
413-533-7400

For Defendant Juan Perez:
Vincent A. Bongiorni, Esquire
1 Monarch Place, Suite 1850
Springfield, Massachusetts 01144
413-732-0222

I N D E X

| Witness: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Special Agent John Barron | | | | |
| (By Mr. Bongiorni) | 8 | | 44 | |
| | | | 51 | |
| (By Mr. Desroches) | | 33 | | 50 |

E X H I B I T S

No.                                                                Page

                         None.

1                       P R O C E E D I N G S

2

3          THE CLERK:  The matter of the United States of America

4     versus Juan Perez and Alberto Marte, Criminal Case No.

5     16-30044.

6          THE COURT:  Alright.  So I have a motion by -- well,

7     first let me swear in the interpreter.

8          THE CLERK:  Yes, your Honor.

9          (The Interpreter was sworn.)

10          THE COURT:  So I have a motion on behalf of Mr. Marte

11     to join in -- I assume it's a Motion to Join in Motion No. 521

12     that was filed on behalf of Mr. Perez.  I'm going to grant that

13     motion.

14          MR. BONGIORNI:  Thank you.

15          THE COURT:  I do want to talk to you, Mr. O'Donald,

16     later.  We'll have just a brief conversation later.

17          MR. O'DONALD:  Thank you.

18          THE COURT:  So this is an evidentiary hearing at the

19     request of the defendants, Mr. Perez and Mr. Marte, as to the

20     existence or nonexistence of a joint investigation between the

21     government of the Dominican Republic and the DEA.  I wanted to

22     raise one other point before we get started.

23          Let me ask you, Mr. Desroches, I believe that there is

24     a separate motion pending on behalf of Mr. Perez and Mr. Marte,

25     possibly other defendants, concerning the identity of a

1    confidential informant; is that correct?

2            MR. DESROCHES:  That is -- well --

3            THE COURT:  What is the status of that motion?

4            MR. DESROCHES:  Just to be clear, the motion is in

5    regards to the defendant receiving an unredacted affidavit.  So

6    the defendant asserts that it's related to the identity of a

7    confidential informant.  The Government has filed responses.

8    But that is pending.  We have a status of August 29th before

9    Judge Mastroianni.

10           THE COURT:  Alright.  But it has not been ruled on.

11           The only reason I'm raising this is I just would want

12   the parties to be vigilant.  I'm not going to permit any

13   questions this morning that would -- as long as that motion

14   remains unresolved and there is this question pending about the

15   identity of a confidential informant, I don't want questions

16   posed to any witness today that would have a bearing on the

17   identity of a confidential informant.  I don't think it's

18   relevant to the question here.  So I just would ask that you

19   both be vigilant in that respect.

20           Is that understood, Mr. Bongiorni?

21           MR. BONGIORNI:  It is.

22           THE COURT:  You can address it, yeah.

23           MR. BONGIORNI:  I do want to -- there are individuals

24   who are referenced in the affidavit of Agent Barron.  Not in

25   the affidavit that he filed as part of your order, but within

1      the affidavit.  I think the Government --

2              THE COURT:  Within what affidavit?

3              MR. BONGIORNI:  The initial affidavit for the wiretap,

4      and some of the references make reference to the Dominican

5      wiretap as well.  I think the Government's issue is, the

6      Government at least is -- and I don't want to speak for

7      Mr. Desroches, but I think what he's trying to say is the

8      Government is not prepared to admit or deny that anybody is a

9      confidential informant at this point, and what we have moved

10     for before Judge Mastroianni is to be provided with a complete

11     copy of the application that was provided to him.  We've had

12     two statuses.  Judge Mastroianni ordered the Government to file

13     a redacted version of its response and provide it to me.  I

14     then filed an opposition, and we now have a status with respect

15     to just that -- I think just that issue, as to wether or not

16     the Government's redacted submission to me is sufficient for us

17     to go forward.

18              THE COURT:  Is sufficient.

19              Well, so let me put it this way.  Let me just say that

20     to the extent that there are -- if there is a question posed

21     that causes concern about anybody's safety, so to speak, I just

22     would want to hear an objection.  And to the extent that the

23     Court need -- you know, that counsel wants to be heard, I could

24     hear you at sidebar if that was important.  But I don't -- you

25     know, given that we're talking about two affidavits filed by

1    the same agent, the affidavit that was filed in response to my

2    request for additional information related to the Dominican

3    wiretap, and an affidavit that was filed in support of the

4    Title 3 application, I just want to make sure that we don't --

5              MR. BONGIORNI:  Overlap.

6              THE COURT:  Overlap, yeah.

7              MR. DESROCHES:  Yes, your Honor.

8              THE COURT:  Okay.  So vigilance.  Thank you.

9              Alright.  So this is the defendant's motion and it's

10   an evidentiary hearing that we've convened at the defendant's

11   request.

12             MR. BONGIORNI:  Right.

13             THE COURT:  So I will let the defendants move forward

14   and call their witness or witnesses.

15             MR. BONGIORNI:  I'm going to call Agent Barron since

16   he was the author of the affidavit.  I'd only ask that if the

17   Government intends to call any other witnesses, that we have an

18   agreement with respect to a sequestration.

19             MR. DESROCHES:  There's no other witnesses, your

20   Honor.

21             THE COURT:  There are no other witnesses.  Alright.

22   Fine.

23             So Agent Barron.

24             (The Witness was sworn.)

25             (Pause.)

1          MR. BONGIORNI:  Are we all set, may I proceed?

2          THE COURT:  No, let's wait a minute.  Just a minute.

3          MR. BONGIORNI:  Wait a minute.  Okay.

4          THE COURT:  Alright.  That's fine.  Thank you,

5     Mr. Bongiorni.

6          MR. BONGIORNI:  Thank you.

7          **DIRECT EXAMINATION OF SPECIAL AGENT JOHN BARRON**

8     **BY MR. BONGIORNI:**

9     **Q.**   Good morning, Agent Barron.

10    **A.**   Good morning, Mr. Bongiorni.

11    **Q.**   I want to direct your attention to an affidavit that you

12    filed in response to the Court's order in this case that is

13    dated sometime in February of -- February 14, 2018.

14         Do you remember executing that affidavit?

15    **A.**   I do.

16         THE COURT:  Could I stop you just for a minute and ask

17    whether either of the parties have a spare copy of that

18    affidavit.  I would --

19         MR. BONGIORNI:  I may.

20         THE COURT:  We can print one out if we don't have one,

21    but I did not happen to bring one up to the courtroom with me

22    and I think it would be helpful.

23         MR. BONGIORNI:  I have one right here, Judge, if you'd

24    like it.

25         THE COURT:  Thank you.

1          MR. BONGIORNI:  (Inaudible) multiple copies.

2          (Inaudible) do you want me to write on it?

3          THE COURT:  No.  Thank you.  No.  Thank you very much.

4          Alright.  Go ahead, Mr. Bongiorni.  I apologize.

5          MR. BONGIORNI:  Sure.

6    BY MR. BONGIORNI:

7    **Q.**   You were asked, were you not, to provide some written

8    answers to a series of question that the Court had ordered the

9    Government to respond to?

10   **A.**   Yes, I was.

11   **Q.**   Now, your involvement in the Marte investigation began in

12   January of 2016?

13   **A.**   That is correct.

14   **Q.**   And the topic that you were providing information on was a

15   wiretap in the Dominican Republic that took place approximately

16   some eight or nine months before you became involved in this

17   investigation?

18   **A.**   I believe it was about a year, yes.

19   **Q.**   So the wiretap that you were asked to make comments about

20   took place or began about a year prior to your executing -- to

21   your becoming involved with the Marte investigation; is that

22   fair to say?

23   **A.**   Yes, sir.

24   **Q.**   Your involvement in the Marte investigation, was that a

25   referral from another department or another resident office

1    within DEA?

2    **A.**    It was a little bit of both.  It was a little bit of

3    information that I gathered here on my own and then a little

4    bit of information that came from another office.

5    **Q.**    And at some time in January, did you receive information

6    from the field district in New York?

7    **A.**    I did.

8    **Q.**    Did that information include the existence of the

9    Dominican wiretap, in other words, when you got the information

10   in January, did whoever provided you with that information, and

11   I presume it was a DEA agent in New York?

12   **A.**    It was.

13   **Q.**    Were you provided information about the existence of the

14   Dominican wiretap?

15   **A.**    At that time, I was not.

16   **Q.**    So when would you say it was that you first learned about

17   the Dominican wiretap?

18   **A.**    It would be an estimation, but I would think several weeks

19   to a month into my investigation.

20   **Q.**    You authored an affidavit in this case as part of a

21   Title 3 order that was dated on April 15th of 2016, is that

22   correct, in terms of the chronology?

23   **A.**    I thought the date was a little later in April, but around

24   the middle of April, yes.

25   **Q.**    Would you agree with me just generally that that affidavit

1  in support of the T3 order references the Dominican wiretap?

2  **A.**   It does.

3  **Q.**   So you would have learned about the Dominican wiretap

4  sometime between being first alerted by the New York Field

5  Office in January 2016 and the date in April when you authored

6  the wiretap?

7       MR. DESROCHES:  Objection, your Honor, to the form of

8  the questioning.  I believe these have all been leading

9  questions and it is his witness.

10       THE COURT:  It is his witness.  It's an evidentiary

11  hearing, it's not a trial.  I think I'm going to permit leading

12  questions.

13       MR. BONGIORNI:  I'm trying to make it go quickly.  I

14  know Mr. Desroches would like to see this stretch out for

15  hours, but I'm going to try to get to the point.

16       THE COURT:  No.  I'm going to permit some leading

17  questions.

18       If you think that there's a misrepresentation here, if

19  you think it's in some form --

20       MR. DESROCHES:  Yes, your Honor.

21       THE COURT:  I will listen to that objection.

22       Go ahead, Mr. Bongiorni.

23  BY MR. BONGIORNI:

24  **Q.**   So the time period that I just referenced for you, the

25  time period you first learned about the Dominican wiretap, was

1    sometime between January of 2016 and April of 2016?

2    **A.**    That's correct.

3    **Q.**    Did you attend a meeting in March of 2016 with agents from

4    the Special Operations Division and the New York, Puerto Rico

5    and New England Field Offices?

6    **A.**    Yes.

7    **Q.**    Would that have been -- that would have been in the month

8    of March?

9    **A.**    I believe so.

10   **Q.**    So did the individuals who were present at that meeting,

11   were they known to you?

12   **A.**    Some were and some were not.

13   **Q.**    Was the topic of the Dominican wiretap discussed during

14   that meeting?

15   **A.**    I don't recall.

16   **Q.**    When you came to prepare your affidavit, the affidavit in

17   response to the Court's order to address certain issues, the

18   affidavit that was authored in 2018, did you personally

19   communicate with any of the individuals who were at that March

20   meeting with respect to how you were going to answer the

21   questions that the Court was ordering the Government to answer?

22   **A.**    Yes, I did.

23   **Q.**    Who did you speak with in that regard?

24   **A.**    My first call was to my Division Counsel, Cara Krysil.

25   She was not at that meeting.  She agreed to handle a certain

1    part of the, what I would call investigation into the questions

2    that were posed by the Court.  My first call went to Special

3    Agent Manuel Rego out of New York, who is the lead investigator

4    of the New York investigation.  My second call went to -- she's

5    now a group supervisor, but she was a special agent in the

6    Dominican Republic at the time, Special Agent Roxana Pulido.

7    **Q.**   Let me see if I can make sure I understand.

8         You made three phone calls, some of whom were to

9    people at the meeting in March?

10   **A.**   Two of which.

11   **Q.**   Two of which, and that would have been the resident agent

12   in the country office --

13   **A.**   Roxana Pulido.

14   **Q.**   -- in Santo Domingo, and the other one would have been to

15   the case agent in the New York Field Office?

16   **A.**   The lead investigator out in New York, yes, Manuel Rego.

17   **Q.**   To your knowledge, the other individual you met, you

18   mentioned, was your lead counsel?

19   **A.**   Correct.

20   **Q.**   So that was an attorney that represents the DEA with

21   respect to issues that might arise like this?

22   **A.**   Correct.

23   **Q.**   To your knowledge, did you request that she question

24   anybody in the Special Operations Division?

25   **A.**   Yes.

1  **Q.**   Do you know who that was that she questioned, and I'm just

2  looking for a yes or no?

3  **A.**   The last name is McGovern, I believe the first name is

4  Robert.  He's an attorney with the Special Operations Division.

5  **Q.**   So an attorney for the DEA spoke to an attorney for the

6  Special Operations Division?

7  **A.**   Correct.

8  **Q.**   Now, the Special Operations Division provides

9  investigative leads and intelligence?

10  **A.**   The Special Operations Division primarily disseminates

11  information between offices and deconflicts between offices.

12  If I have an investigation here, they have an investigation

13  there, Special Operations primarily acts as a liaison between

14  the two offices.

15  **Q.**   Well, the Special Operations were at least involved in

16  this case, correct?

17  **A.**   Yes.

18  **Q.**   And the target, if you will, or one of the main targets of

19  the wiretap here, was a gentleman by the name of Sergio Gomez

20  Diaz; am I correct?

21  **A.**   Yes.

22  **Q.**   Based on the affidavit you executed in support of the

23  Title 3 order, Gomez Diaz was a Dominican National who was a

24  multi-kilo broker of cocaine from Venezuela to the Dominican

25  Republic to New York, and the head of that particular

1    organization was a Columbian National who resided in Venezuela?

2    **A.**    That sounds correct.

3    **Q.**    Gomez Diaz had been the subject of prior DEA

4    investigations in Miami and New York and elsewhere?

5    **A.**    I believe that is correct as well.

6    **Q.**    Did you ever personally question anybody in the Special

7    Operations Division or was your questioning limited to the two

8    attorneys?

9    **A.**    Are you referring to my affidavit, sir?

10    **Q.**    Your affidavit of the -- I'm sorry -- of February 2018.

11    **A.**    I didn't speak to any attorneys other than my division

12    counsel.  I spoke to case agents other than --

13    **Q.**    Case agents?

14    **A.**    Yes.

15    **Q.**    Now, the DEA has a Caribbean section, correct?

16    **A.**    It does.

17    **Q.**    And there's a main office, if you will, in Puerto Rico?

18    **A.**    Correct.

19    **Q.**    A division office, and then there's a series of what are

20    called country offices, correct?

21    **A.**    That's correct.

22    **Q.**    A country office is usually staffed by one or more agents

23    and a series of intelligence analysts?

24    **A.**    As well as a Country Attache.

25    **Q.**    As well as a Country Attache.

1          Ordinarily, they operate out of our embassies in those

2     locations where they exist?

3     **A.**   That's fairly typical, yes.

4     **Q.**   Could you tell me, if you know, for how long the

5     individual who was in the Santo Domingo country office, and I

6     believe you said the name was -- was it Pulido?

7     **A.**   Roxana Pulido.

8     **Q.**   Pulido.

9          For how long, as of February 2018, had Roxane Pulido

10    been stationed as the agent in the Santo Domingo office?

11    **A.**   As of February 2018, she was no longer stationed in the

12    Dominican office.  She had been promoted.  I believe she was in

13    Puerto Rico.

14    **Q.**   Was she the resident agent in the Santo Domingo office

15    prior to the wiretap, the Dominican wiretap, being initiated?

16    **A.**   When you refer to a resident agent, a special agent

17    working in that office?

18    **Q.**   A special agent working in that office.

19    **A.**   She was.

20    **Q.**   Did the DEA also have what are called vetted agents or

21    vetted employees in that office that would not be governmental

22    employees, but people who were paid salaries?

23    **A.**   That's a difficult question for me to answer.  Let me tell

24    you what I do know.  The DEA has agents and analysts working

25    down there.  They then, when you say "vet," the groups that

1    work with the DEA down there, which are actually Dominican

2    Nationals, Dominican police departments, DNCD to be particular,

3    DEA vets them.  They do background investigation on them to

4    make sure that the information that we are sharing with them

5    and they are sharing with us is not going to be corrupted.

6              Is that what you're referring to, sir?

7    **Q.**   Well, do those individuals -- let me maybe back it up.

8              There are several kinds of vetted employees, correct?

9    **A.**   Yes.

10   **Q.**   There are what I would call local police departments in

11   the DR, in the Dominican Republic, and then there are

12   individuals who provide information?

13   **A.**   I can't answer that accurately.  I don't know.

14   **Q.**   So do you know, on your own personal knowledge, whether or

15   not the DEA has some form of Memorandum of Understanding

16   regarding cooperation with the Dominican authorities?

17   **A.**   I don't know.

18   **Q.**   Did you ever determine or attempt to find that out when

19   you were executing the February 2018 affidavit?

20   **A.**   That is not a question I asked, no.

21   **Q.**   Are you aware of whether or not the DEA has Memorandums of

22   Understanding anywhere in the Caribbean with other either

23   foreign nations or the territory of Puerto Rico?

24   **A.**   I don't know.

25   **Q.**   So you indicated in the body of your affidavit that you

1    were confident that you spoke to everyone who would have

2    knowledge that was relevant to whether or not there was a joint

3    investigation between the DEA and the Dominican Republic.

4    **A.**   I did.

5         THE COURT:  The most relevant knowledge is what he

6    represents in the affidavit.

7         MR. BONGIORNI:  The most relevant knowledge, okay.

8         THE COURT:  Most relevant.

9    BY MR. BONGIORNI:

10   **Q.**   But you'll agree with me that in that regard, you did not

11   speak directly to anyone --

12        (A cell phone rings.)

13        MR. BONGIORNI:  Excuse me, Judge, I'm...

14        (Cell phone turned off.)

15   BY MR. BONGIORNI:

16   **Q.**   That you didn't speak to anybody in the Special Operations

17   Division directly?

18   **A.**   I did not speak to anybody in the SOD directly.

19   **Q.**   To your knowledge, did the DEA, in 2016, have a systemwide

20   lead tracking system?

21        Do you know what I mean when I say that?

22   **A.**   No, you need to be a little more specific, sir.

23   **Q.**   Well, the DEA has an overseas or a foreign operations

24   division, correct?

25   **A.**   We have nothing that's called the foreign operations

1    division that I know of.

2    **Q.**   Is it an Office of International Affairs?

3    **A.**   We do have that.

4    **Q.**   Within the Office of International Affairs, does the DEA

5    have the ability to track information that comes to each of the

6    country offices?

7    **A.**   I see where you're going now.

8         So you're asking me if there is a way to track leads,

9    so if I was providing information to somebody in another

10   office, is there a way to track those leads?

11   **Q.**   Sure.

12   **A.**   In some instances, yes, there is.

13   **Q.**   But in 2016, would you agree with me that there was no way

14   that the DEA had systematically to track if like the Special

15   Operations Division provided information to the Dominican

16   authorities that led to the issuance of a wiretap, you wouldn't

17   be able to determine that by accessing a system that would have

18   it?

19   **A.**   I cannot answer that question.  I don't know.

20   **Q.**   So would you agree with me that the universe of people

21   that you spoke to with respect to these questions was

22   Ms. Pulido, who was the Country Attache resident agent, and the

23   gentleman that you identified from the Field Office of

24   New York, I forget what his name was?

25   **A.**   Manny Rego.

1    **Q.**   Manny Rego.

2         Were those the -- was that the universes of

3    individuals that you spoke directly to?

4    **A.**   And Division Counsel, Cara Krysil.

5    **Q.**   But were you seeking legal advice from her or was she just

6    providing you a source of information that she was receiving

7    from some other third party?

8    **A.**   The latter which you just said.

9    **Q.**   So she --

10   **A.**   She was speaking to certain individuals.  We basically

11   broke up the task.  There were four very specific questions

12   listed there.  I sent her those questions.  I said we need to

13   talk to a certain number of people to try and answer these

14   questions.  She handled part of the task, I handled part of the

15   task, we spoke again, and we generated an affidavit.

16   **Q.**   So just so I'm clear, this affidavit that you authored

17   wasn't based upon your personal knowledge in the sense that you

18   actually knew these facts or you were able to look at a

19   document and say this is what it reflects, you were relying on

20   what someone else was telling you occurred?

21   **A.**   Both.  I was relying on what I learned from an agent in

22   the Dominican Republic --

23   **Q.**   Right.

24   **A.**   -- an agent in New York, and my conversations with

25   Ms. Krysil, who had spoke to an attorney in SOD, as well as a

1    Country Attache in the Dominican Republic.

2    **Q.**   But when you asked the questions, for instance, of the

3    agent in the Dominican Republic, would you agree with me that

4    you didn't ask her whether or not the individuals who applied

5    for the Dominican wiretap had been in any way funded or trained

6    or supported by the United States Government through the DEA,

7    did you?

8    **A.**   I did not.

9    **Q.**   And the DEA does provide both training, funding and

10   intelligence information with respect to certain

11   investigations?

12   **A.**   I believe it does.

13   **Q.**   Based on your knowledge of the investigations, is it your

14   belief or is it your testimony that the Dominican investigation

15   predated the investigation that was aimed at Sergio Gomez Diaz?

16   **A.**   My investigation?

17   **Q.**   No, the --

18          THE COURT:   Yeah.   This investigation in this context

19   is a completely vague and uninformative term.

20          MR. BONGIORNI:   Sure.   I will --

21   BY MR. BONGIORNI:

22   **Q.**   There was, prior to the Dominican wiretap, DEA had

23   investigations that were directed at Sergio Gomez Diaz?

24   **A.**   I've heard they had, yes.

25   **Q.**   Well, you included that information in the wiretap

1    affidavit that you authored, correct?

2    **A.**    Yes.

3    **Q.**    And you identified those areas of the country, including

4    Miami and New York, that had investigations directed at that

5    individual, correct?

6    **A.**    Correct.

7    **Q.**    In fact, the field district in New York had an

8    investigation that was directed at Sergio Gomez Diaz that was

9    actually active, which is how your Field Office came into this

10   portion of the investigation?

11   **A.**    That's correct.

12   **Q.**    So the investigation centers around Sergio Gomez Diaz and

13   an unknown Columbian National originally?

14   **A.**    (Inaudible) in the investigation, yes.

15   **Q.**    Correct.

16          And was that information --

17          (A cell phone rang.)

18          THE COURT:  Uh --

19          MR. BONGIORNI:  Apparently, I don't even know how to

20   turn it off.

21          Why don't you turn that off.

22          I apologize.

23          THE COURT:  That's alright.  Go ahead.

24   BY MR. BONGIORNI:

25   **Q.**    So the investigation by the New York office that was

1    directed against Sergio Gomez Diaz was operational before your

2    investigation in January of '16?

3    **A.**    If operational means in existence, yes.

4    **Q.**    Yes.

5         And do you know from what period of time it had been

6    in existence?

7    **A.**    I don't know exactly, no.

8    **Q.**    Do you know, at least based on your conversations with the

9    agent in New York, whether it had any connection to the wiretap

10   in the Dominican Republic?

11   **A.**    I don't know the answer to that.

12   **Q.**    Is that because you don't know?

13   **A.**    Yes, because I don't know.

14   **Q.**    So would you agree with me that the individual that you

15   queried in preparation for preparing your affidavit, the

16   gentleman, is it Manuel --

17   **A.**    Rego.

18   **Q.**    Manuel Rego.  So you never questioned him about whether or

19   not his Field Office had been involved with the Dominican

20   authorities in that wiretap?

21   **A.**    My questions to him were very specific in regards to the

22   Court's questions to the Government.  I posed the questions as

23   they were written in the Court's order to them.  I said, "Did

24   you initiate an investigation with the Dominican authorities?"

25   He answered, "No."

1   **Q.**   Well, did you ask whether or not he shared information of

2   his investigation with the Dominican authorities?

3   **A.**   I did not.

4   **Q.**   Or did you ask him whether or not he had requested some

5   assistance based on the information that he had produced, or

6   whether he shared that information with the Dominican

7   authorities?

8   **A.**   I asked him very specific questions which were detailed by

9   the Court to the Government.

10   **Q.**   So would you agree with me that you were attempting to

11   make your questions to him as narrow as you possibly could?

12   **A.**   No, I wouldn't agree.

13   **Q.**   Well, you were confining it, at least, to only those

14   questions that were in the Court's order?

15   **A.**   I was posed with the task.  I did my task.

16   **Q.**   So with respect to the wiretap in the Dominican Republic,

17   when you were attempting to answer the Court's questions, would

18   you have questioned anybody in the DEA about whether or not

19   they had provided technical assistance to the individuals in

20   the Dominican Republic?

21   **A.**   Could you define what you mean by technical assistance?

22   **Q.**   Well, sure.  Provide monitoring equipment paid for through

23   a grant for local officers to get overtime pay to monitor an

24   operation like that.

25          When you have a wire -- let me stop for a minute.

1          When you have a wiretap that exists for 15 months,

2     it's manpower intensive?

3     **A.**    That's correct.

4     **Q.**    So it usually involves a fairly large expenditure of

5     money, even to run one like the one that you did?

6     **A.**    It does.

7     **Q.**    So did you ever attempt to inquire as to whether or not

8     the United States Government, through the DEA, had ever

9     provided any financing for the wiretap that resulted in the

10    interception of Mr. Marte's communications?

11    **A.**    I did not inquire specifically about Mr. Marte's

12    communication.  That's a specific wiretap.  I do know that DEA

13    does fund, as you say, technical equipment and that type of

14    thing for Dominican Nationals.

15    **Q.**    Do they also -- remember we had talked about those vetted

16    employees.  Is there a thing within the Country Attache called

17    a Sensitive Investigations Unit employees, SIU?

18    **A.**    I have heard of SIU, yes.

19    **Q.**    Did you make any inquiry to determine whether or not any

20    of the DEA's SIU employees in the country office in

21    Santo Domingo were involved in this wiretap?

22    **A.**    I don't believe that was a question posed by the Court to

23    the Government.

24    **Q.**    Can you tell -- would such information exist?

25    **A.**    I don't know.

1    **Q.**   Well, these individuals are paid, aren't they?

2    **A.**   Are you referring to the office in (inaudible)?

3    **Q.**   Well, the officers, if they have vetted special

4    investigative units, those are individuals that work directly

5    with DEA in those country offices?

6    **A.**   Correct.

7    **Q.**   Are they paid by the United States Government?

8    **A.**   I don't know the answer to that.

9    **Q.**   If they were, would you agree with me that there would be

10   a record of it?

11          MR. DESROCHES:  Objection, your Honor.  When he says

12   he doesn't know if these things exist, I think this is a very

13   hypothetical question.

14          THE COURT:  I think Agent Barron can say whether or

15   not he knows.  If he doesn't know, that's --

16          THE WITNESS:  I don't know.

17   BY MR. BONGIORNI:

18   **Q.**   So it's possible that people -- that the United States

19   Government paid for people to work in the Dominican Republic on

20   this wiretap, you just didn't go to those areas to look or you

21   didn't ask these particular questions?

22   **A.**   I asked questions very specific to what the Court ordered.

23   **Q.**   Right.

24          So if the -- do you know whether or not the Special

25   Operations Division provided investigatory leads to the

1    New York Field Office?

2    **A.**   Yes, they did.

3    **Q.**   And the New York Field Office was the individual office

4    that had an up-and-running extant investigation aimed at Sergio

5    Gomez Diaz?

6    **A.**   Yes.

7    **Q.**   Can you tell me whether or not the Special Operations

8    Division had also targeted Mr. Sergio Gomez Diaz in the Miami

9    investigation?

10   **A.**   The Special Operations Division doesn't target anybody.

11   They act as an intermediary between two offices.

12   **Q.**   Was there an office -- did the Caribbean office contain a

13   country office in Venezuela?

14   **A.**   I'm not positive.   I believe so, but I'm not sure.

15   **Q.**   Do you know whether or not they had one at one time in

16   Caracas?

17   **A.**   I believe they did.

18   **Q.**   Do you believe that there was an office in Caracas as of

19   the time that the New York Field Office began its investigation

20   of Sergio Gomez Diaz and the Columbian individual residing in

21   Venezuela that was suspected of being the source of Gomez

22   Diaz's drugs that were being funneled to New York?

23   **A.**   You're asking if I believe there was an office in Caracas

24   at that time?

25   **Q.**   Yes.

1   **A.**   Yes, I do.

2   **Q.**   Now, the Special Operations Division would be able to have

3   contacts with all of those offices, Caracas, Santo Domingo,

4   Miami, New York?

5   **A.**   Yes.

6   **Q.**   Can you tell me what the purpose, or what your

7   understanding was of the purpose, for a Special Operations

8   Division individual being at the March meeting, the meeting

9   that you were informed about the wiretap?

10  **A.**   The Special Operations Division --

11          THE COURT:  Wait a second, wait a second.  What was

12  the question?

13          It ended and I didn't hear the end of the question.

14          MR. BONGIORNI:  I'm sorry.

15  BY MR. BONGIORNI:

16  **Q.**   What was your understanding of the purpose of the March

17  meeting at which there was Special Operations Division

18  personnel present?

19  **A.**   The Special Operations Division, in the best layman's term

20  I can explain it in, is like a broker.  They bring people

21  together to share information.

22          So if I'm going to run a wiretap, I need to contact

23  the SOD, the Special Operations Division, let them know I'm

24  running a wiretap, this is who I'm running it on, these are the

25  numbers I'm looking at.  Other offices do the same thing, they

1    provide that information to the Special Operations Division.

2          When some of this information intersects, as it did in

3    this case, they will then say okay, Agent, Barron, you need to

4    talk to Agent Pulido in the Dominican Republic because some of

5    her information is overlapping with some of your information.

6    They will then bring those people together and say

7    Agent Barron, this is Agent Pulido, you guys should have a

8    conversation.

9    **Q.**   Would Special Operations also share information with

10   foreign police forces?

11   **A.**   I don't know the answer to that.

12   **Q.**   So they may, you just don't know one way or the other?

13   **A.**   Correct.

14   **Q.**   So if the Special Operations Division forwarded

15   intelligence that was used in obtaining the Dominican wiretap,

16   you just either didn't question the appropriate person or you

17   don't know the answer?

18   **A.**   I could tell you the Special Operations Division in this

19   case, this investigation, did not forward any information to

20   the Dominican Nationals.

21   **Q.**   Is that based on your personal knowledge or is that based

22   on a conversation that you had with someone else?

23   **A.**   That is based on a conversation that Cara Krysil had with

24   the attorney in Special Operations, who then spoke with several

25   people that are involved in this investigation.

1    **Q.**   Now, the Special Operations does not usually advertise

2    it's work, right?

3    **A.**   That's correct.

4    **Q.**   It's a departmentalized, fairly secretive, portion of the

5    DEA?

6    **A.**   I don't know if it's really a secret.  We're talking about

7    it in open court right here (inaudible).

8    **Q.**   Well, you're talking -- have you known any agent of the

9    Special Operations Division who has testified under oath in a

10   courtroom, in an open court?

11        MR. DESROCHES:  Objection.

12        THE COURT:  Yeah, I'm going to sustain the objection.

13   BY MR. BONGIORNI:

14   **Q.**   In any event, just so I can make sure that I've -- that

15   the number of individuals that you spoke to, really, who might

16   have personal knowledge, were the individual in Santo Domingo

17   and the gentleman in New York, correct?

18   **A.**   Correct.

19   **Q.**   And anything else that you would have learned, either from

20   the counsel for -- your legal counsel or SOD's legal counsel,

21   was all knowledge that was not first-hand and is based on them

22   speaking to perhaps two or three or four other individuals?

23   **A.**   It was based on Ms. Krysil speaking with an attorney in

24   SOD and the Country Attache in the Dominican Republic.

25   **Q.**   So, once again, that wouldn't be based on your personal

1   knowledge, correct?

2   **A.**   Correct.

3   **Q.**   With respect to the individuals who actually ran the

4   wiretap in the Dominican Republic, you can't tell us whether or

5   not they were paid by the United States Government through the

6   DEA, correct?

7   **A.**   I cannot.

8   **Q.**   You don't know whether the investigative leads were

9   provided by vetted individuals employed by the DEA in the

10  Sensitive Investigations Unit working out of that country

11  office?

12  **A.**   That's correct.

13  **Q.**   And whether or not the DEA provided either equipment or

14  technical assistance, you wouldn't know because the two people

15  you spoke to weren't asked those questions?

16  **A.**   I believe I answered that DEA does provide them with the

17  equipment to monitor these phones.

18  **Q.**   And with respect to funding, you wouldn't know one way or

19  the other whether or not this was a fairly expensive

20  proposition of more than a year-long wiretap?

21  **A.**   Agreed.

22  **Q.**   The target of the Dominican wiretap was not Sergio Gomez

23  Diaz, but an individual named Kevin?

24  **A.**   The target of which Dominican wiretap?

25  **Q.**   The Dominican wiretap that we're talking about here, the

1    one that took place in the Dominican Republic and lasted for

2    approximately 13 or 14 months.

3    **A.**    The target of their wiretap is Sergio Gomez.  That's who

4    they were listening to.

5    **Q.**    And it wasn't somebody other than Sergio Gomez?

6    **A.**    I don't know who else is involved in that investigation.

7    I can tell you that they were listening to Sergio Gomez.

8    **Q.**    You don't know whether or not the DEA had one or more

9    active investigations aimed at Sergio Gomez Diaz before the

10   Dominican wiretap began?

11   **A.**    I don't know if they were active.  I know he had been

12   named in at least one, maybe two, prior investigations prior to

13   that.

14   **Q.**    But you don't know whether those -- when he was named in

15   those prior investigations, that that was before the Dominican

16   wiretap began?

17   **A.**    I don't know.

18              MR. BONGIORNI:  I don't have any further questions.

19              THE COURT:  Alright.  Mr. O'Donald, any questions for

20   Agent Barron?

21              MR. O'DONALD:  Your Honor, I don't have any questions.

22              THE COURT:  So Mr. Desroches?

23              MR. DESROCHES:  Thank you, your Honor.

24

25

**CROSS-EXAMINATION OF SPECIAL AGENT JOHN BARRON**

BY MR. DESROCHES:

Q.   Good morning, Agent Barron.

A.   Good morning, Mr. Desroches.

Q.   So you had just been asked some questions about your preparation to write an affidavit that you filed with this court; is that correct?

A.   That's correct.

Q.   You indicated that you spoke to, directly, Special Agent Manuel Rego; is that correct?

A.   Correct.

Q.   Can you please describe what his role is.

A.   He was the lead investigator of the Sergio Gomez and Rudy Gomez investigation operating out of New York.

Q.   Why did you speak to him?

A.   Because he was part of the group that passed me the original information and part of the group that had been dealing directly with the Dominican Republic.

Q.   When you described that that group was investigating Sergio Gomez and another individual by the name of Rudy Gomez, is it your understanding that Rudy Gomez was operating in New York?

A.   It is.

Q.   And is it also your understanding that Sergio Gomez was supplying Rudy Gomez with heroin from the Dominican Republic?

1    **A.**    That's my understanding, yes.

2    **Q.**    So their primary interest at that point was the

3    distribution of heroin in New York; is that fair to say?

4    **A.**    Correct.

5    **Q.**    When you spoke to Special Agent Rego, did you believe that

6    he would have answers to questions as to whether or not they

7    requested the Dominican Nationals initiating wiretap into --

8    I'm sorry, involving Sergio Gomez?

9    **A.**    I did.

10    **Q.**    Did you believe he would be one of your best sources of

11    information from that office regarding that question?

12    **A.**    I did.  He was the lead investigator in that

13    investigation.

14    **Q.**    Do you recall approximately when that investigation began

15    in New York?

16    **A.**    Sometime a few months before my investigation began here

17    in Massachusetts.  I would think late 2015.

18    **Q.**    So you said you also spoke to a Roxana Pulido; is that

19    correct?

20    **A.**    Correct.

21    **Q.**    Why did you speak to Ms. Pulido?

22    **A.**    Because she was the lead investigator operating out of

23    New York in this investigation -- excuse me, operating out of

24    the Dominican Republic in this investigation.

25    **Q.**    And --

1          THE COURT:  When you say "this investigation," Agent

2    Barron, could you be more specific about which investigation

3    you're talking about.

4          THE WITNESS:  Yes.  Sergio Gomez/Rudy Gomez/Alberto

5    Marte investigation.

6          THE COURT:  So you're calling that a single

7    investigation?

8          MR. DESROCHES:  If I could ask questions (inaudible).

9          THE COURT:  Yeah.

10   BY MR. DESROCHES:

11   **Q.**   So just so we're all clear, let's refer to the

12   investigation targeting Sergio Gomez as the 2015 investigation.

13   **A.**   Okay.

14   **Q.**   And the investigation that you conducted into Mr. Marte is

15   the Marte investigation.

16   **A.**   Correct.

17   **Q.**   And the investigation out of New York as the New York

18   investigation.

19   **A.**   Okay.

20   **Q.**   So, now, with that in mind, what role did Ms. Pulido play?

21   **A.**   Ms. Pulido was an agent operating in the Dominican

22   Republic who was passing information she gained through the

23   Dominican Republic's investigation down there to Mr. Rego in

24   New York.

25   **Q.**   So her role was to pass information she got from Dominican

1    authorities to New York; is that correct?

2    **A.**    Correct.

3    **Q.**    Did you believe that she would have information that was

4    responsive to the Court's order in regards to the wiretap?

5    **A.**    I did.

6    **Q.**    Did you believe that she was in the best position to

7    answer those questions?

8    **A.**    I did.

9    **Q.**    You also indicated you spoke to Cara Krysil, who is the

10   Division Counsel for the DEA.

11   **A.**    Yes.

12   **Q.**    Can you describe what her role is.

13   **A.**    She is the DEA's attorney operating in Boston,

14   Massachusetts.

15   **Q.**    When you spoke to her, was it clear to you that she

16   understood why you were speaking to her?

17   **A.**    It was.

18   **Q.**    She reached out to other parties as well, correct?

19   **A.**    Correct.

20   **Q.**    Including Division Counsel for the SOD; is that right?

21   **A.**    Correct.

22   **Q.**    What role does the Division Counsel for SOD play?

23   **A.**    They are the attorney on record for the Special Operations

24   Division.

25   **Q.**    Have you reviewed the response from that attorney?

1   **A.**   I did.

2   **Q.**   Was that informative to you in regard to the Court's

3   questions?

4   **A.**   It was.

5   **Q.**   Did you learn -- and what did you learn from that inquiry

6   to the SOD?

7   **A.**   That the SOD did not pass any leads to the Dominican

8   Republic, that SOD did not initiate any investigation with the

9   Dominican Republic, and that SOD did not maintain any records

10  of any information coming back and forth between the Dominican

11  Republic and the United States.

12  **Q.**   Did you also learn that the SOD is not engaged in a joint

13  investigatory relationship with the Dominican Republic?

14  **A.**   I did.

15  **Q.**   In fact, what role did the SOD play in this

16  investigation -- I'm sorry, in the Marte investigation, your

17  investigation?

18  **A.**   They acted as an intermediary between the DEA in

19  Massachusetts, the DEA in New York, and the DEA in the

20  Dominican Republic.

21  **Q.**   Now, that meeting that you testified to that occurred at

22  SOD in March of 2016, is it fair to say the purpose of that

23  meeting was to deconflict with other offices in the DEA?

24  **A.**   Correct.

25  **Q.**   Is that consistent with the role that the SOD played

1    throughout the Marte investigation?

2    **A.**    It is.

3    **Q.**    You also indicated that Ms. Krysil spoke to the Country

4    Attache for the Dominican Republic.

5    **A.**    That's correct.

6    **Q.**    What role does the Country Attache play in the Marte

7    investigation?

8    **A.**    Specifically in the Marte investigation, none.

9    **Q.**    What role does the Country Attache play in the New York

10   investigation?

11   **A.**    Zero.

12   **Q.**    And what role does the Country Attache play in the 2015

13   investigation?

14   **A.**    None that I know of.

15   **Q.**    What information would the Country Attache have that would

16   be relevant to the questions this Court asked?

17   **A.**    She would be able to provide Ms. Krysil with the DEA's --

18   Mr. Bongiorni's Memorandum of Understanding.  I don't know if

19   there's a National Memorandum of Understanding, but DEA's

20   policies so far as how things are handled between the

21   United States and the Dominican Republic.

22   **Q.**    What did you learn from those conversations?

23   **A.**    The DEA does not initiate investigations in the Dominican

24   Republic.

25   **Q.**    In terms of the ongoing involvement of the DEA -- I'm

1     sorry, strike that.  We'll get to that in a moment.

2           Based on your conversations with Ms. Pulido and your

3     review of documents and the conversations you had with

4     Special Agent Rego, did you learn when the 2015 investigation

5     in the Dominican Republic started?

6     **A.**   I know their first order for a wiretap was in January of

7     2015, so it would have to predate that.

8     **Q.**   So because the wiretap began in January 2015, the

9     investigation would have had to start prior to that date; is

10    that correct?

11    **A.**   Correct.

12    **Q.**   When did the Marte investigation start?

13    **A.**   January of 2016.

14    **Q.**   And you testified that the New York investigation began

15    approximately two or three months prior to the Marte

16    investigation?

17    **A.**   That's what I believe, yes.

18    **Q.**   So is it fair to say that the Dominican Republic was

19    investigating Sergio Gomez independently for over a year prior

20    to when the Marte investigation started?

21    **A.**   That's correct.

22    **Q.**   Did you learn that the DEA never requested that that

23    wiretap of Mr. Gomez Diaz, the 2015 wiretap, had no -- the DEA

24    did not request that wiretap?

25    **A.**   The DEA did not request that wiretap.

1    **Q.**   Did you learn -- did the DEA request that Dominican

2    officials apply for the court order authorizing that wiretap?

3    **A.**   They did not.

4    **Q.**   Did you learn that the DEA became aware of the

5    investigation long after its inception?

6    **A.**   I did.

7            THE COURT:  Became aware of *the* investigation?

8            MR. DESROCHES:  I'm sorry, the 2015 investigation well

9    after the inception.

10           MR. BONGIORNI:  The Dominican Republic investigation,

11   is that because there's --

12   BY MR. DESROCHES:

13   **Q.**   You may answer the question, Agent Barron.

14   **A.**   Yes, I am.

15   **Q.**   Did the DEA agents or anyone in the DEA supervise, direct

16   or control the Dominican wiretap that intercepted

17   Defendant Marte's communications with the target of that

18   Dominican Republic investigation?

19   **A.**   They did not.

20   **Q.**   When was Mr. Marte intercepted on that Dominican wiretap?

21   **A.**   It was the beginning of March of 2016.  I actually

22   received the information on March 16, 2016.

23   **Q.**   And it was intercepted in 2016 as well?

24           THE COURT:  Wait a second.  Yeah, he just -- did you

25   just testify that he was intercepted in March of 2016 on --

1    that's what he said; isn't that right?

2              THE WITNESS:  Yes, that's correct.

3              THE COURT:  So that was the only time; is that right?

4    BY MR. DESROCHES:

5    **Q.**   Is that correct, how many times was Mr. Marte, to your

6    knowledge, intercepted?

7    **A.**   Twice.

8    **Q.**   When did the second interception occur?

9    **A.**   They were within several hours or a day of each other.

10   They were fairly close.

11   **Q.**   And that occurred over a year after the Dominican wiretap

12   was initiated; is that correct?

13   **A.**   Correct.

14   **Q.**   Did DEA agents personally participate in the intercepting

15   and recording of Mr. Marte's communications with the target of

16   the Dominican wiretap?

17   **A.**   They did not.

18   **Q.**   You testified in response to Attorney Bongiorni's

19   questions about funding that the DEA gives to the Dominican

20   Republic.

21   **A.**   Yes.

22   **Q.**   Is that funding specific to the Marte investigation?

23   **A.**   It is not.

24   **Q.**   Is it specific to any investigation?

25   **A.**   It's not.

1    **Q.**   So how is it then, based on your knowledge, given or

2    provided to the Dominican Republic?

3    **A.**   How is the funding provided to them?

4    **Q.**   Correct.

5    **A.**   I don't know exactly.

6    **Q.**   Is it specific to an investigation?

7    **A.**   It is not.

8    **Q.**   So it's a general grant of money to the Dominican Republic

9    in order to conduct general investigations?

10   **A.**   Counter-narcotics investigations.

11   **Q.**   In terms of the equipment, did the DEA provide equipment

12   that was used specifically -- I'm sorry, strike that.

13          Did the DEA specifically provide information or

14   equipment to authorities in the Dominican Republic in order to

15   conduct the investigation that resulted in Mr. Marte being

16   intercepted?

17   **A.**   No.

18   **Q.**   So how is it that the DEA provides equipment to the

19   Dominican Republic?

20   **A.**   They provide -- I would say in Mass., they provided

21   equipment necessary to conduct counter-drug investigations.

22   **Q.**   Again, that's not specific to any particular

23   investigation; is that correct?

24   **A.**   No.

25   **Q.**   So is it fair to say that the extent of the cooperation

1    between the Dominican Republic and the DEA in this case, in the

2    Marte investigation, was the provision of the two interceptions

3    that occurred in March 2016 and that involved Mr. Marte?

4    **A.**   I wouldn't say it's the full extent of it, but that's

5    where things began.

6    **Q.**   Well, what is the full extent of it?

7    **A.**   What assistance did the DNC provide DEA in regards to

8    Mr. Marte?

9    **Q.**   Correct.

10   **A.**   Past information on Sergio Gomez, I would say.  Most of

11   this information though went to New York, not directly to me in

12   Massachusetts.

13   **Q.**   So the extent was sharing of information?

14   **A.**   Correct.

15   **Q.**   Now, based on your conversations with the people that

16   we've discussed and Ms. Krysil's conversations that you've had

17   an opportunity to review, how do you believe that you can

18   answer these questions?

19           How is that you believe you can answer these

20   questions?

21   **A.**   I believe I asked the two people who would have knowledge

22   to answer these four questions, specifically the questions that

23   they were posed, and they had the knowledge and they were in

24   the position to answer those questions accurately.

25   **Q.**   And do you believe that the individuals Ms. Krysil spoke

1    to also had the relevant information?

2    **A.**   I do.

3          (Pause.)

4          MR. DESROCHES:  Thank you.  I have no further

5    questions.

6          THE COURT:  Alright.  Mr. Bongiorni, any

7    cross-examination?

8          MR. BONGIORNI:  Sure.

9    **REDIRECT EXAMINATION OF SPECIAL AGENT JOHN BARRON**

10   **BY MR. BONGIORNI:**

11   **Q.**   Agent Barron, with all the questions that Mr. Desroches

12   just posed to you, you're relying on what someone else

13   represented to you, correct?

14   **A.**   I am.

15   **Q.**   Your beliefs are not based on personal knowledge about

16   things that you saw or could read or touch, but they're based

17   on conversations that other people have had with other people,

18   correct?

19   **A.**   That's correct.

20   **Q.**   To your knowledge, would Ms. Pulido have been in a

21   position, if a Dominican wiretap was initiated by the Dominican

22   authorities, based on the -- if there's a Memorandum of

23   Understanding or the fact that they have a Country Attache

24   there with Dominican authorities, alert DEA to the fact that

25   they were going to be running a wiretap?

1    **A.**   Can you ask that question one more time?

2    **Q.**   Sure.

3         When you spoke to Ms. Pulido in preparation for

4    executing your affidavit, did you ask her whether or not the

5    authorities in the Dominican Republic would provide her with

6    information that they had a wiretap potentially (inaudible)

7    telephones or cell phones in the United States as part of the

8    protocol?

9         THE COURT:  Yeah.  Could you rephrase that --

10        MR. BONGIORNI:  Sure.

11        THE COURT:  -- maybe break it down into a couple of

12   questions?

13        THE WITNESS:  It's kind of a broad question.

14        MR. BONGIORNI:  I can do that.

15   BY MR. BONGIORNI:

16   **Q.**   Sergio Gomez Diaz was a target of the New York wiretap and

17   so was Rudy Diaz?

18   **A.**   I believe Sergio Gomez Diaz was the target of a Dominican

19   Republic wiretap.

20   **Q.**   Right.

21        And Rudy Diaz, was he a target of a wiretap in the

22   New York district?

23   **A.**   Not by DEA, but by another agency.

24   **Q.**   By another agency.

25        Was Rudy Diaz someone who had been exposed to the

1    New York office through the Dominican wiretap?

2    **A.**    Rudy Diaz?

3    **Q.**    Rudy Diaz.

4    **A.**    Rudy Gomez?

5    **Q.**    Rudy Gomez Diaz.

6    **A.**    Is Rudy Gomez someone -- maybe one more time.

7    **Q.**    Sure.  Let me maybe back it up.

8    **A.**    You're starting to confuse me with that.

9    **Q.**    Sergio Gomez Diaz, I believe you testified, was an

10   individual who stayed in the Dominican Republic, and he

11   brokered, essentially, sales of heroin and cocaine to

12   individuals in the United States?

13   **A.**    Yes.

14   **Q.**    One of those individuals was an individual in New York who

15   was related to him in some way?

16   **A.**    Correct.

17   **Q.**    And what was that relationship?

18   **A.**    I believe he was his nephew.

19   **Q.**    So Sergio -- I'm going to use the last name -- Diaz, in

20   the Dominican Republic, has a nephew -- you believe is a

21   nephew, named Rudy Diaz in New York?

22   **A.**    Correct.

23   **Q.**    And Rudy Diaz obtains quantities of whatever controlled

24   substances that Sergio Diaz brokers in the Dominican Republic?

25   **A.**    Correct.

1    **Q.**   So when the Dominican authorities conducted a wiretap, and

2    you believe it took place in January of 2015, Sergio Gomez Diaz

3    was a target of that wiretap, correct?

4    **A.**   Correct.

5    **Q.**   As a result of that wiretap, Rudy Diaz was identified in

6    New York?

7         THE COURT:  If you know.

8    **Q.**   If you know.

9    **A.**   I think eventually yes, he was.

10   **Q.**   So Ms. Pulido, based on her position in the DEA, would she

11   have been aware of the existence of the January 2015 wiretap,

12   Dominican wiretap?

13   **A.**   She would not be aware of that wiretap until it became

14   pertinent to her.

15   **Q.**   So the Dominican authorities, based on your

16   conversation -- was this based on your knowledge or based on a

17   conversation with her?

18   **A.**   This is based on my conversation with her.

19   **Q.**   They wouldn't have told her until it became pertinent to

20   her?

21   **A.**   Correct.

22   **Q.**   And how would the Dominican authorities determine whether

23   or not it was pertinent to her?

24   **A.**   When that person that they were intercepting started

25   dialing or talking to telephones which they believed were in

1    the United States.

2    **Q.**   So at least there was some understanding that officials in

3    the Dominican Republic, once they saw area codes that were from

4    the United States, would that alert the Country Attache office?

5    **A.**   If those calls were deemed pertinent by the Dominican

6    Nationals and they were to United States area codes, they would

7    then pass that information along.

8    **Q.**   So Ms. Pulido wouldn't have anything to do or any

9    knowledge about the Dominican wiretap, in terms of how it was

10   initiated, who provided the information for it, or anything

11   like that?

12   **A.**   She has basic knowledge of how it was initiated, like what

13   brought Sergio Gomez onto the radar, but nothing specific.

14   **Q.**   Nothing.

15          So she wouldn't have specific information about how

16   the Dominican authorities came to obtain that wiretap because

17   she wouldn't actually even be notified that it was in existence

18   until such time as that wiretap began to identify area codes in

19   the United States?

20   **A.**   She would have the orders which they filed with the judge,

21   the judiciary down there, detailing their information.  It's

22   kind of the same view as if I had the information, but I don't

23   know past that.  I can't answer past that.

24   **Q.**   Well, when you say she would have the information in the

25   court order, she wouldn't have the information in the court

1    order when the court order was initially authorized?

2    **A.**    That's correct.

3    **Q.**    She wouldn't get it until somebody in the Dominican

4    authorities now recognizes that that wiretap is picking up

5    American area codes, and then they go to her office and notify

6    her:  Listen, we've now began to intercept people in the United

7    States?

8    **A.**    That's correct.

9    **Q.**    So she wouldn't have any information with respect to who

10   provided the information for the wiretap, what went into it,

11   where the investigative leads came from, where the probable

12   cause came from, she wouldn't have any idea about that?

13   **A.**    She may have asked them at that point, but I can't answer

14   that question.

15   **Q.**    Because you didn't ask?

16   **A.**    Correct.

17   **Q.**    So it's your testimony, I just want to make clear, that

18   there was no employee of the DEA or the United States

19   Government that either took part in the wiretap, in the

20   application for that wiretap, or provided information to

21   Dominican authorities to get that wiretap?

22   **A.**    That's correct.

23           MR. BONGIORNI:  I don't have any further questions.

24           THE COURT:  Mr. Desroches, anything else?

25           MR. DESROCHES:  Yes, if I may.

1          **RECROSS-EXAMINATION OF SPECIAL AGENT JOHN BARRON**

2   **BY MR. DESROCHES:**

3   **Q.**   In regards to the Dominican Republic investigation, based

4   on your conversations with Ms. Pulido, did you learn what

5   triggered the investigation in the Dominican Republic by the

6   Dominican Nationals?

7   **A.**   I did.

8   **Q.**   What was that?

9   **A.**   There was an airplane seized which was being used to

10   transport (inaudible) being used to transport drugs between the

11   Dominican Republic and Venezuela.  That airplane had some type

12   of ties to Mr. Gomez.  I don't know exactly what those ties

13   were.

14   **Q.**   That was seized by the Dominican Nationals, correct?

15   **A.**   That's correct.

16   **Q.**   The DEA had no role in that seizure; is that correct?

17   **A.**   That's correct.

18   **Q.**   Ultimately, that seizure is what led to the wiretap in the

19   Dominican Republic; is that right?

20   **A.**   That's correct.

21       MR. DESROCHES:  Thank you.  I have no further

22   questions.

23       THE COURT:  Alright.

24

25

1          **CONTINUED REDIRECT EXAMINATION OF SPECIAL AGENT BARRON**

2     **BY MR. BONGIORNI:**

3     **Q.**   So --

4              THE COURT:  Well --

5              MR. BONGIORNI:  Just --

6              THE COURT:  One.

7              MR. BONGIORNI:  One.

8     BY MR. BONGIORNI:

9     **Q.**   You referenced a document that you received from Special

10    Operations Division, a document that you were testifying from

11    in terms of what your belief was.

12             Did I understand Mr. Desroches asked you a question

13    about a document you had received?

14    **A.**   There was an e-mail received, yes.

15    **Q.**   An e-mail.

16             Would you voluntarily produce that e-mail?

17             THE COURT:  Um --

18             MR. DESROCHES:  Objection.  Thank you.

19             THE COURT:  The objection is sustained.

20    BY MR. BONGIORNI:

21    **Q.**   With respect to the seizure of the airplane, did the

22    Special Operations Division have anything to do, based on your

23    knowledge, with the seizure of that airplane?

24    **A.**   Not to my knowledge.

25    **Q.**   You're not saying that couldn't have happened, you just

1  wouldn't know about it?

2  **A.**   Correct.

3        MR. BONGIORNI:  Thank you.  I have no further

4  questions.

5        THE COURT:  Alright.  So what I take it I have in

6  front of me is sort of a renewed request by the defense for

7  access to certain information related to the Dominican wiretap.

8  I will hear from counsel for the defense with respect to -- now

9  that they've had the opportunity to have the evidentiary

10  hearing, I think I'd like to hear the argument now rather than

11  requiring written submissions.  That would be my preference

12  because I don't want hold a decision on this issue up further.

13        If you feel strongly that you'd prefer to do it by

14  written submissions, I'll hear you, but I will set a

15  comparatively tight time frame.

16        MR. BONGIORNI:  No, I think I can make our position

17  fairly clear.

18        THE COURT:  Clear.  Okay.

19        MR. BONGIORNI:  One of the problems that I had with

20  the process was that the Court, who is the fact finder who is

21  tasked with finding facts, has to rely, as we have here, on

22  multiple and triple levels of hearsay, and that's why I think

23  in the last submission I asked the Court to formulate a

24  standard, because I'm sure these things are going to come up in

25  the future.  It's difficult if you have to make a determination

1    about whether or not something did or did not occur, or you

2    don't have an opportunity to see live witnesses, or you don't

3    have an opportunity to see documentary evidence that was

4    created by individuals who have, in fact, personal knowledge.

5    I know that's the standard in the civil side of it for summary

6    judgment motions, and while I expect that the Court would

7    consider some hearsay, if you had some indicia of its

8    reliability, I don't know how in this case that you have any

9    indication that what is being represented is reliable because

10   it's really stepped in, at least what I can see, Agent Barron

11   speaks to counsel for DEA, who then speaks to counsel for SOD,

12   who then speaks to someone that we don't know, and then this is

13   supposed to be the kind of factual menu from which a Court

14   could make that finding.

15            THE COURT:  And that is the process that has occurred,

16   it seems to me, in every one of these cases where a defendant

17   has sought access to information on the basis that there is

18   some kind of a joint investigation.

19            MR. BONGIORNI:  Sure.

20            THE COURT:  I mean, I don't know of any criminal case

21   that's established the kind of standard that you're alluding

22   to, Mr. Bongiorni.

23            MR. BONGIORNI:  I tried to find one and the caselaw is

24   fairly all over the lot, so to speak.

25            THE COURT:  Right.

1          MR. BONGIORNI:  I couldn't find anything that clearly

2     said it.  Obviously, there are some in which hearsay is

3     permitted, but this is the kind of hearsay that I think

4     really -- that you have to say is not truly reliable, that is

5     because we're having to speculate about what did or did not

6     happen.

7          I understand the difficulty with that because

8     Agent Barron really didn't have anything to do with this

9     investigation, but that's why --

10         THE COURT:  When you say "this investigation" --

11         MR. BONGIORNI:  Well, this investigation, I'm talking

12    about the investigation of Sergio Gomez Diaz --

13         THE COURT:  In the Dominican Republic.

14         MR. BONGIORNI:  -- in the Dominican Republic.

15         THE COURT:  He is thoroughly versed, however, in the

16    investigation, the initiation of the investigation of

17    Mr. Marte.

18         MR. BONGIORNI:  Sure.  Absolutely.

19         THE COURT:  He is versed -- he has personal knowledge

20    or collective knowledge, you know, gained by interactions with

21    other agents who worked on the investigation of Mr. Marte.  He

22    has personal knowledge in that regard or collective knowledge

23    with respect to the process that was followed in the

24    investigation of Mr. Marte, and the points at which he obtained

25    evidence or information that he included in the affidavit in

1    support of the Title 3 application.

2              MR. BONGIORNI:  Absolutely, and I don't question that.

3              THE COURT:  Right.  Okay.

4              MR. BONGIORNI:  But the real issue here is we made a

5    claim that we believe the investigation in the Dominican

6    Republic that gave rise to the wiretap wasn't solely and

7    exclusively a Dominican Republic invention or initiation, and

8    that the United States Government was involved in it, and that

9    there is evidence out there of the joint nature of that

10   investigation.

11             The problem with conducting a hearing in this regard

12   is that all of the questions that could be asked, Agent Barron

13   didn't ask.  He asked closed-end questions, did this happen,

14   did that happen, and that's simply insufficient, because as we

15   know, there are a whole host of other things that go on in

16   these investigations to which either he wasn't privy to or he

17   didn't ask the questions to find out the answers to.

18             So that's our --

19             THE COURT:  That's a position.

20             MR. BONGIORNI:  That's our position and --

21             THE COURT:  So the argument, essentially -- I just

22   want to make sure I understand it.

23             MR. BONGIORNI:  Sure.

24             THE COURT:  The argument is that the investigation

25   into Sergio Gomez Diaz, your contention is that the

1    investigation in the Dominican Republic into Sergio Gomez Diaz,

2    that that was a joint -- that may have been a joint

3    investigation, and if that was a joint investigation, then you

4    would be entitled on that basis to information related to the

5    initiation of the wiretaps in the Dominican Republic of Sergio

6    Gomez Diaz.

7              Is that correct?

8              MR. BONGIORNI:  Yes, and that's because without that,

9    if that was the case, then Mr. Perez would be entitled to

10   challenge that communication in an American court.

11             THE COURT:  Mr. Perez was not intercepted.

12             MR. BONGIORNI:  Well, I'm not sure that

13   Mr. Perez was -- I'm not conceding that Mr. Perez was not

14   intercepted because while the Government provided me with a

15   copy, it did not provide me a copy of a return that would show

16   who the people were who were intercepted.  The only reason we

17   became aware of it is because the two conversations that were

18   intercepted of Mr. Marte that occurred, I think, on two days --

19             THE COURT:  But those are not included.  In other

20   words, there was no -- the affidavit in support of the

21   application to intercept Mr. Marte's communications does not

22   rely to any extent on any interception of Mr. Perez on the

23   Dominican wiretap.

24             MR. BONGIORNI:  No, it does not.

25             THE COURT:  Okay.

1          MR. BONGIORNI:  I just don't -- I just can't be sure

2     whether or not Mr. Perez was intercepted or not because I don't

3     have a return.

4          THE COURT:  But what you're looking for is --

5          MR. BONGIORNI:  What I'm asking the Court to do --

6          THE COURT:  Okay.  That it seems fairly far aloof, but

7     go on.

8          MR. BONGIORNI:  Is that the process employed here is

9     insufficient to be able to determine whether or not there was a

10    joint investigation.

11         So on behalf of Mr. Perez, every part of the hearsay

12    that Mr. Barron testified to, I would move to strike, and based

13    on if the Court would allow that motion, based on what's left,

14    it's really an insufficient record to say that there was no

15    evidence of joint venture, because the real evidence of joint

16    venture was never explored, was never gone into, and that, I

17    think, is as succinctly as I can put it.

18         THE COURT:  Okay.  Mr. O'Donnell?

19         MR. O'DONALD:  I have nothing else to add.

20         THE COURT:  You have nothing to add to that?

21         MR. O'DONALD:  Thank you.

22         THE COURT:  Alright.  Mr. Desroches?

23         MR. DESROCHES:  Thank you.

24         Your Honor, I would suggest that the defendant's

25    belief that the investigation that occurred in the

1    Dominican Republic in 2015 was somehow guided or influenced by

2    American authorities is abject speculation.  It's not supported

3    by anything in the record.  The defendant can point to nothing

4    in the hundreds of pages of affidavits that they're in

5    possession of.  There's nothing that supports that assertion in

6    the Dominican orders that they've been provided showing that

7    these were judicially-authorized wiretaps.  There's nothing

8    there except their stated belief that there was some

9    involvement.

10          I would suggest to you what Special Agent Barron

11   testified to day were the results of his diligent investigation

12   into answering this Court's questions.  He selected the people

13   who may be involved who he believed would have the answers.

14   Division Counsel for DEA did the same for her counterparts and

15   they found that there was no involvement in the investigation.

16   Specifically, in pointing to the actors raised in Valdivia,

17   very importantly in this case I would suggest is the initiation

18   of the Dominican investigation occurring more than a year prior

19   to the investigation into Mr. Marte, and well before the

20   New York Division's investigation into an associate of

21   Sergio Gomez Diaz, and based on an event that occurred, the

22   seizure of the plane.  That was completely independent of

23   American intervention or American information.

24          Therefore, this investigation was organic to the

25   Dominican Republic, existed for well over a year prior to the

1    investigation of Mr. Marte.  There's no evidence whatsoever

2    that the DEA or any American authority was involved in either

3    investigation directing the wiretap.  In fact, you heard that

4    the order was applied for in January 2015 by Dominican

5    authorities.  I have no urging of this of the American

6    authorities, and that was true throughout the course of the

7    investigation.

8            To the extent that there was communication between

9    Dominican authorities and American authorities is simply

10   information sharing.  As Agent Barron testified to, that

11   occurred at the SOD in order to deconflict, make sure that

12   people weren't getting in each other's ways.

13           Therefore, your Honor, I would suggest that much of

14   the testimony, yes, was based on hearsay, but necessarily it is

15   within this Court's discretion to accept that testimony.  As

16   you heard, this was -- there's no, I would suggest, one person

17   to answer these questions, and I believe the agent testified

18   credibly when he said that these are the people he believed

19   would have the answers.

20           The defendant, even if -- and as I've argued

21   previously, if the defendant were able to make any showing, it

22   is their burden, and I'd suggest there hasn't been any showing.

23   But even if they were, it will then make some showing

24   whatsoever.  This is, as your Honor noted, very far removed

25   from anything that's material in this case.  It's as if they

1    want the -- they're arresting in their proposition that if the

2    DEA was involved in an investigation, then we get everything

3    that happened in the Dominican Republic without considering

4    materiality, which is the next step.

5            I would suggest, your Honor, because there's no

6    evidence of a joint investigation, particularly pointing to the

7    actors in Valdivia, that this defense motion should be denied,

8    and I would ask the Court to do so.

9            THE COURT:  Okay.  Anything further, Mr. Bongiorni?

10           MR. BONGIORNI:  Only that I dispute that it was our

11   burden.  I brought the motion originally because I said if the

12   information exists, it's exculpatory, and because under the

13   local rule which really broadens Brady.  So the burden is on

14   the Government to produce it.

15           THE COURT:  I think the cases pretty clearly say that

16   the burden is on the defendant to make a showing.

17           MR. BONGIORNI:  Well, I don't know if anybody

18   specifically, as we did, said if you look at the local rule,

19   and by extension, it's exculpatory if it casts doubt on the

20   admissibility of evidence, and if this in fact was a joint

21   investigation, then to that extent it does.

22           But I'll wait for the Court's ruling.  I appreciate

23   the fact that we had an evidentiary hearing.

24           THE COURT:  Okay.

25           MR. BONGIORNI:  As I said, I still believe that this

1   falls far short of the best way to ascertain the facts in this

2   case.

3            THE COURT:  What would you have suggested was the best

4   was to ascertain the facts in this case?

5            MR. BONGIORNI:  I think that part of the burden should

6   have been on the Government to produce live witnesses subject

7   to cross-examination.

8            THE COURT:  Alright.  Anything else?

9            MR. BONGIORNI:  Or to at least make a search for

10  documentary evidence that would -- in terms of financing and

11  things like that.

12           THE COURT:  Alright.  Anything else?

13           MR. O'DONALD:  No, your Honor.

14           THE COURT:  Thank you.

15           MR. O'DONALD:  Thank you, your Honor.

16           THE COURT:  Alright.  Thank you.

17           So, Mr. O'Donald, let me just talk to you briefly at

18  sidebar.

19

20           (End of unsealed portion of hearing.)

21

22

23

24

25

C E R T I F I C A T I O N

     I, Karen M. Aveyard, Approved Federal Court Transcriber, do hereby certify that the foregoing transcript, consisting of 61 pages, is a correct transcript prepared to the best of my skill, knowledge and ability from the official digital sound recording of the proceedings in the above-entitled matter.

/s/ Karen M. Aveyard

Karen M. Aveyard

August 28, 2018

Date